OPINION OF THE COURT
Lee L. Holzman, J.
In this motion for summary judgment, the nominated executor under the propounded instrument dated January 14, 1949 seeks a judgment admitting the will to probate. The New York Province for the Society of Jesus (the Jesuits) is the sole beneficiary under the propounded instrument and the president of the Society is the nominated executor.
Decedent died on December 28, 1986 at the age of 72. He *43 was survived by two brothers, one of whom filed objections to probate. The objectant alleged that the instrument was not executed in accordance with the required statutory formalities, that it was a product of fraud and undue influence and that decedent executed it by mistake without having read it. The objectant subsequently died and his daughter, in her capacity as the executrix of his estate, was substituted as a party in his place. Movant contends that the objections fail to raise any legitimate factual issue as to the validity of the instrument.
Movant notes that a Jesuit is free to dispose of his property to whomever he wishes prior to taking his final vows. However, in conjunction with taking his final vows, which include a pledge to be completely dependent upon the Society, a Jesuit is required to execute a will leaving his entire estate to the Society. He is also required to execute other documents in which he represents that he does not believe that he presently owns any property and that, if he is mistaken in this belief, he shall give it to the Society. He also agrees to renounce any property that he might thereafter be entitled to receive by inheritance and that he will give to the Society any property thereafter acquired by gift or legacy other than by inheritance. Decedent entered the Society on February 1, 1932 and took his perpetual vows in 1934. It was not until January 1949 that he executed the propounded instrument, the other required documents and took his final vows.
The propounded instrument was executed in the office of John A. Hughes, S. J., the rector (President) of St. Andrew-on-the-Hudson in Poughkeepsie, New York. The witnesses to the instrument were Father Hughes, Father Gargan and Father Fingerhut, all members of the Society of Jesus. No attorney was present. All three of the attesting witnesses are now dead but Father Hughes survived the decedent and was deposed by both parties on April 20, 1988.
The deposition of Father Hughes, who was born in 1900, is typical of the deposition that might be taken of many people who have lived for more than eight decades. Occasionally, it would take some time before he fully grasped the inquiry directed at him but, once fully focused, his recall of events occurring almost 40 years earlier was as good as could be expected from anyone.
Father Hughes’ answers to questions posed by counsel for the proponent as well as some of his answers to questions *44 posed by counsel for the objectant indicated that he had known the decedent since he first entered the Society, approximately 17 years prior to January 1949, that decedent had known from the time that he had entered the order that he would execute a will leaving his entire estate to the Society if he decided to take his final vows, that decedent was of sound mind and free from restraint when he signed the will, that decedent requested those present to witness the will and that decedent and the attesting witnesses all signed in the presence of each other. Furthermore, the witness stated that he was charged with supervising the execution of wills in his capacity as the rector and that it was his policy to read the document aloud before the actual signing.
Objectant contends that the testimony raises factual issues as to whether the decedent acknowledged to the attesting witnesses that the instrument was a will and as to whether he requested that they serve as attesting witnesses. She also asserts that there is an issue as to whether decedent or the witnesses first signed the instrument. Lastly, objectant argues that there are serious questions as to whether the will was a product of undue influence as a result of the following: the confidential relationship between the sole beneficiary and the testator (Matter of Putnam, 257 NY 140), the presence of only members of the Society at the execution ceremony, the policy of the Society not to allow the testator to take his final vows unless he executed the will, and the statement of the testator to his niece in the days immediately prior to his death that he had no will and wanted to make one.
The death of all of the people present at the execution ceremony cannot be ignored. Should this case be submitted to a jury, they will not have the opportunity to view witnesses to assess their credibility. Instead, their determination would be based solely upon the evidence presently before the court. The attestation clause in the propounded instrument states that the will was "signed, sealed, published and declared, by the above testator as and for his last Will and Testament in the presence of us, who, at his request, in his presence, and in the presence of each other, have hereunto subscribed our names as witnesses thereto.” The facts set forth in an attestation clause are prima facie evidence of those facts and together with other evidence may suffice to establish the validity of the will even though the attesting witnesses thereafter fail to recall the facts set forth therein or testify to the contrary (Matter of Cottrell, 95 NY 329; Matter of Watts, 71 Misc 2d *45 621; Matter of Bright, 20 Misc 2d 789, affd 12 AD2d 745; Matter of Zipkin, 3 Misc 2d 396).
Here, the testimony of the then surviving attesting witness did not contradict any statement contained in the attestation clause. At most, in response to leading questions, which were posed and answered in succession rather than read and digested at the leisure of the elderly witness, the witness candidly stated that he could not definitively state that he had an independent recollection as to any of the specifics of an event occurring almost four decades earlier. However, he repeatedly insisted that he knew the decedent well and that the decedent knew that he was executing a will leaving his entire estate to the Society. The witness also consistently stated that he had supervised many will execution ceremonies in his status as rector, that it was his custom to read the entire instrument aloud before it was executed, and that he was confident that he had done so in this case.
The only admissible proof that could be adduced before a jury on the issues of testamentary capacity and due execution are the attestation clause and the deposition of Father Hughes. Based upon this evidence, the court would be obliged to direct a verdict in favor of the proponent (Matter of Cottrell, supra; Matter of Watts, supra; Matter of Bright, supra; Matter of Zipkin, supra). To rule to the contrary would result in denying probate to instruments whenever objections have been interposed and the attesting witnesses candidly cannot recall the specific details about an event which lasted for less than an hour decades earlier. Although the admission of a will to probate is a solemn event, due execution and testamentary capacity must be proved by only a preponderance of the evidence (Matter of Kumstar, 66 NY2d 691) rather than beyond a reasonable doubt because the doors of the courts should be open more easily to carry out a testator’s last wishes than the doors of the prisons to incarcerate those guilty of a crime.
Objectant’s allegations as to undue influence are no more persuasive than her other contentions, notwithstanding that decedent could not have taken his final vows unless he executed the propounded instrument. Influence and undue influence are not synonymous.
The testator’s will is not rendered invalid merely because its provisions were the quid pro quo for something that the testator received. A will which is the product of an offer and *46 an acceptance resulting in a binding contract to make a joint will, or not to revoke a joint will, is sanctioned by the provisions of EPTL 13-2.1 (b). Consequently, it cannot be concluded that an arrangement under which a religious entity is named as the sole beneficiary of a will in exchange for lifetime membership, which entitles the member to have his basic needs taken care of for life, violates public policy or constitutes undue influence per se.
Objectant has failed to lay bare any evidentiary facts which would warrant submitting the question of undue influence to a jury (Matter of Kumstar, supra; Matter of Fiumara, 47 NY2d 845; Matter of Walther, 6 NY2d 49). The decedent did not take his final vows and execute his will until 17 years after he had joined the Society. This belies any claim that he was hastily pressured into making an irrevocable decision to leave everything to the Society. Decedent had ample time to change his mind. Notwithstanding decedent’s vow of poverty, he appears to have accepted money from his father and died with approximately $100,000 in his own name. Similarly, if decedent was not satisfied with the will at any time within the approximately 38 years that he lived after executing it, he could have executed another will without the Society being any the wiser and left it up to the court to decide whether he had retained this right. Inasmuch as decedent opted not to revoke his will, the court need not pass upon movant’s contention that decedent was contractually obligated to leave his entire estate to the Society even if he had not done so by will.
Decedent’s alleged statement to the objectant shortly prior to his death to the effect that he had no will and wanted to make one does not create any factual question on the issue of either testamentary capacity or undue influence. Notwithstanding that this offer of proof would be barred by CPLR 4519 if movant objected thereto at the trial, it can be considered to defeat the motion for summary judgment if it creates a pertinent factual issue. (Phillips v Kantor & Co., 31 NY2d 307.) However, it creates no factual issue. Statements allegedly made 38 years after the will was executed are too remote in time to have any probative value. Absent unusual circumstances, the permissible time frame for inquiry about events relating to the decedent’s capacity is a period from three years prior to the execution of the will to two years thereafter (see, Matter of Partridge, 141 Misc 2d 159; Matter of Weth, 135 NYS2d 70; Uniform Rules for Trial Cts [Surrogate’s Ct], 22 NYCRR 207.27). It might be reasonable to infer from the *47 decedent’s alleged statement that he did not have testamentary capacity at the time that he made the statement because he no longer remembered 38 years after he had executed the will that he had one, or that he did not want the objectant either to know about his testamentary plans or to pester him about those plans. However, it cannot be inferred from this statement that the decedent did not know what he was doing 38 years earlier or that he was unduly influenced at that time. This is certainly the case here where decedent had known for at least 17 years before he executed the will that he would have to execute the will leaving everything to the Society if he wanted to take his final vows.
Objectant has failed to show that there are any triable issues of fact and the motion for summary judgment is granted.